IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| ARTIE ARMOUR | § | |
| v. | § | CIVIL ACTION NO. 6:18cv535 |
| LORIE DAVIS, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Artie Armour, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil action complaining of alleged violations of his constitutional rights.  The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment pursuant to 28 U.S.C. 636(c).  The named defendants are TDCJ-CID Director Lorie Davis, TDCJ Executive Director Bryan Collier, and Wardens Jerry Catoe, Jeffrey Richardson, and Patrick Cooper of the Coffield Unit.

**I. Background**

Armour's amended complaint (docket no. 15) is the operative pleading in the lawsuit. *See* Clark v. Tarrant County, Texas, 798 F.2d 736, 740 (5th Cir. 1986) (amended complaint entirely supersedes and takes the place of an original complaint).

In his amended complaint, Armour states that he seeks relief from: being housed in a 45 square foot cell with another prisoner 24 hours a day for weeks at a time; being deprived of five hours of uninterrupted sleep on a nightly basis; overcrowded showers which create a safety and health hazard and cause him to suffer fear of attack and to be subject to sexual advances taking place in the shower; and extreme heat and cold.  Armour states that he is 64 years old and has been subjected to these living conditions for over 30 years.  He takes medication which makes him more susceptible to "heat stress," which he suffers year after year.  He states that "the sleep deprivation, filthy chow hall, no toilets or hot water, over-crowded [sic], and double-celling has become a way

1

of life." Armour states he can remember when there were no lockdowns, but all of these conditions are "precedent and occur continuously."

Armour contends that there is only a pretense of complying with American Correctional Association (ACA) standards because "ACA employees and TDCJ employees are one and the same." He has included the rules governing the defendants in the grievances he has filed, but the defendants' agents have taken steps to prevent the issues from being exhausted.

Armour attaches a memorandum of law, which appears to be a pre-made form. He states that he is filing under the Eighth and Fourteenth Amendments, the Texas Tort Claims Act, common-law negligence, and intentional infliction of emotional distress, and the pendent jurisdiction of the court. He requests certification as a class action and appointment of a special master.

A portion of the form labeled "Parties" starts off by saying "Plaintiff _____, TDCJ # _____, is a citizen of the United States and currently a prisoner in the Texas Department of Criminal Justice, housed at the _____ Unit, located in _____ County, Texas. (Address) _____, City _____, State _____, zip _____. These blanks are filled in with Armour's name and TDCJ number, housed at the Coffield Unit, located in Anderson County, address 2661 FM 2054, city Tenn. Colony, state TX, zip 75884. The body of the form consistently refers to "Plaintiff(s)." The Court will presume that Armour refers to himself when he uses the term "plaintiff(s)."

## II. The Plaintiff's Claims

### A. Double-Celling and Overcrowding

Armour contends that double-celling inmates in a 45 square foot cell for 24 hours a day for weeks at a time is cruel and unusual punishment, citing Ruiz v. Estelle, 679 F.2d 1115 (5th Cir. 1982). He states that the cell only has about 21 square feet of usable floor space and no ladder up to the top bunk, which is the cause of much friction between cellmates. Prisoners are confined to cells like this for 24 hours a day for weeks at a time during lockdowns.

Likewise, Armour complains that the dayrooms are also overcrowded. He says they are rated to hold 48 inmates, but can have 100 or more prisoners crammed into them at chow time, showers,

and during major sports events or movies.  He asserts that the dayrooms have no hot running water, no toilet, and only one urinal.  Because the doors are not opened for "hours at a time," he states that it is not unusual for a prisoner to defecate and throw it out the window, or for an older prisoner on medication to defecate on himself. Armour states that the noise in the overcrowded dayrooms is deafening and there is often no place to sit except on the floor.  He states the prison officials have been asked to reserve cells on One Row or Three Row so as to have a usable toilet, but they will not do so.

Similarly, Armour complains that "many prisoners [sic] think it is all right" to pack over 100 men in a shower containing only 60 shower heads.  He contends that incremental exposure to disease and infection is greatly increased by this, as is the potential for violence when naked men are packed together in the shower.  He says that confinement under these conditions is "intentional infliction of emotional distress, which amounts to cruel and unusual punishment."  He states that the defendants have been given notice and are aware of the overcrowded conditions but have not remedied the situation nor "removed plaintiff(s) from the main building's overcrowded living conditions."

### B. Sanitation

Armour complains that sanitation in the chow hall is "despicable and deplorable."  He says that eating utensils are not properly sanitized after each meal and the spoons are often greasy or have food residue on them.  Cups are often still dirty, trays are not properly dried and still have water on them.  Armour says "Plaintiff(s) has become ill on several occasions after eating in the chow hall."

Furthermore, Armour complains that there are so many flies in the dining area that plaintiff(s) must eat with one hand while fanning flies with the other.  The chow hall is also infested with giant cockroaches, which can be seen crawling on the floor and walls.  He says that "it is common knowledge (i.e. workers and former workers) that the food storage areas and preparation areas are also infested with cockroaches and mice due to the floor being in disrepair."

Armour states that there are also birds flying around inside the chow hall while he is eating. He states that he has been informed that birds eat the cornbread while standing in it defecating, and then the cornbread is served to the prisoners, but he does not indicate who told this to him.

Next, Armour contends that there are standing puddles of dirty water on the floor while he is eating. Food servers usually do not wear gloves and tables are not wiped and sanitized after each use. The ceiling leaks when it rains, with water dripping on tables, and paint can be seen peeling from the ceilings over the dining hall tables. He says it has been reported that black mold is growing in the chow hall, the education department, and in the pipe chases being the cells on several cell blocks.

Likewise, Armour says that the cells are deteriorating, with paint peeling off the walls, lockers, ceilings, and bunks, leaving exposed rust. The sinks only have cold water and the ventilation system is clogged with dust and lint. He states that "many cells" are infested with cockroaches, ants, or spiders, and birds fly in and out of the cells leaving droppings everywhere, but does not allege that his cell is so infested, nor that he has sustained any harm as a result.

C. Sleep

Armour complains that he is denied five hours of uninterrupted sleep, which he says is "intentionally caused by and through the count policy, mail, lay-ins, pill-window, and with the breakfast and shower schedules." He explains that the guards conduct nightly "bed book counts" at 10:30 p.m. on weekdays and at 1:30 a.m. on weekends. He must present his ID card or recite his inmate number to the officer, and if he is asleep, he is awakened every time these counts take place.

Armour also states that there are loudspeakers on each wing and the guards make numerous announcements several times during the night. The speakers are very loud and wake him up each time they are used. Bells ring at count time, one time to get ready, two for the count, and three when the count clears, and this occurs at least three times during the night, at midnight, 1:30 a.m., and 4:30 a.m.. These awaken him each time they are used.

4

Armour states that responses to grievances on this issue have been answered by saying that breakfast begins at 3:00 a.m., but this is false because "a review of the cameras will reveal that chow is dropped to the dayroom anytime about 2:30 a.m.  That means that if plaintiff (s) wants to go to breakfast, he must get up at 2:00 a.m. to prepare, because if he is not ready when the door is opened, the guard will slam it shut.  Thus, even if plaintiff(s) were not awakened repeatedly, he could not get five hours of uninterrupted sleep; if he goes to breakfast at the first 'wing drop,' he may not get back to his bunk until 3:45 a.m., and then showers are at 4:30 a.m.  As a result, plaintiff(s) is suffering chronic fatigue."

D. Understaffing

Armour asserts that the prison is understaffed, saying that each housing wing consists of four rows, with a dayroom for One and Two Row and a dayroom for Three and Four Row.  Each row houses up to 42 prisoners, for a total of 168 inmates on the wing.  Six wings radiate from the rotunda, for a total of 1,004 inmates in a cellblock.  There are guards in the rotunda to roll the cell doors, but each wing has only one officer, which is not enough to monitor this many inmates scattered over four rows and two dayrooms.  He claims that sometimes one guard is assigned to two different wings at once, and the understaffing is even worse at night.  Armour states this situation is "dangerous, unsafe, and contributes to plaintiff(s) anxiety."

E. Windows

Armour states that the exterior wall of the unit buildings is made up of thousands of glass windows.  He asserts that these windows pose a three-fold threat of harm.  First, many of these windows are broken by inmates during the summer because of the heat.  The broken glass is very sharp and can easily be fashioned into a weapon, and "upon further information and belief, the record will show that prisoners and guards have been assaulted with these glass shanks."

Second, Armour complains that the broken windows are not replaced until December or January of the next year, thus "exposing plaintiff(s) to cold temperatures and wind-blown rain." The third alleged threat of harm, according to Armour, lies in the fact that the windows are not tinted,

allowing the sun to shine directly into the cells.  He states the summer temperatures routinely exceed 100 degrees and have been known to reach 120 degrees; he constantly sweats and is fatigued because he cannot sleep due to the heat.  He claims his cell does not cool down to where he can sleep until around 2 a.m., when breakfast starts.

### E. Exercise

Armour states that according to TDCJ policy, general population minimum-in offenders are entitled to receive four hours of out-of-cell or outdoor exercise every day, with one hour not to include dayroom time.  Out of cell exercise is supposed to be called at least twice a day, meaning that in a 31 day calendar period, out of cell exercise should be called 62 times.  However, for the period of what Armour describes as "January 16 to 2016," the average amount of out of cell exercise actually allowed was 13 times per month.  He asserts that this is cruel and unusual punishment.

### F. Cell Ladders

Armour contends that it is dangerous and unsafe not to provide a ladder or steps for prisoners to climb up to and down from the top bunk, which is five feet above the floor.  This causes fights between prisoners, because one has to stand on the bottom bunk to reach the shelves, which are seven to eight feet above the floor.  Armour asserts this is intentional infliction of emotional distress, as well as cruel and unusual punishment.

### G. Liability of the Defendants

Armour states that each of the defendants were notified of the unconstitutional conditions by letters and grievances, but refused to take corrective action.  He says that Lorie Davis is the Director of TDCJ-CID and is "legally responsible for implementing and maintaining all TDCJ -CID regulations, including housing, maintenance, policies governing classification, security, safety, health, medical, and the overall oversight of all conditions of confinement of offenders incarcerated in the Texas Department of Criminal Justice."  He adds that Davis "deprived plaintiff(s) of equal protection and due process and violated plaintiff(s) rights to be free of cruel and unusual punishment, wanton infliction of pain and suffering, denial of medical care, denial of proper

recreation, denial of basic necessities of life, and freedom from inhumane conditions of confinement in violation of the 8th and 14th Amendments to the U.S. Constitution."  Armour has an identical paragraph concerning TDCJ Executive Director Bryan Collier.

With regard to Wardens Catoe, Richardson, and Cooper, Armour has identical paragraphs saying that each of the wardens were "legally responsible for the overall implementation and maintaining of all offenders under his official capacity housed at the H.H. Coffield Unit in Tennessee Colony, Texas, and the regulations of policies, procedures, and rules governing the day-to-day upkeep and care for all offenders under his authority at the confinement."  The paragraph states that each warden "deprived plaintiff(s) of equal protection and due process and equal treatment of individuals similarly situated and violated plaintiff(s) rights to be free of cruel and unusual punishment, wanton infliction of pain and suffering, denial of medical care, denial of proper recreation, denial of basic necessities of life, and freedom from inhumane conditions of confinement in violation of the 8th and the 14th Amendments to the U.S. Constitution."

Armour goes on to allege that "the defendants along with their agents and employees have implemented and maintained policies which enforced unconstitutional living conditions for years throughout TDCJ, particularly at the Coffield Unit, where this plaintiff(s) is housed.  Plaintiff(s) is prepared to produce documentation which will demonstrate that the Defendants have long been aware of these unconstitutional living conditions dating as far back as 1982, when Judge Justice declared these conditions unconstitutional.  Thus plaintiff(s) allege that the totality of his confinement is unconstitutional."

Armour asserts that "the totality of double-celling, sleep deprivation, the absence of toilets in the dayrooms and rec yards, overcrowded showers and extreme heat are sub-human living conditions, which have been repeatedly over the years been brought to the attention of the defendants directly as well as through their agents and employees via the grievance process.  The answer most often given is that Coffield does not have to meet OSHA and ACA standards because it was built prior to the 2250 style units and ingress and egress is done every hour, yet they know

from operation review (cameras) that the doors do not roll for two and three hours with the logs being falsified."

Armour states that as a result of the stress brought on by these conditions, he suffers intense stomach cramps and a constant sensation of needing to use the toilet.  This is aggravated when denied access to the toilet for two or three hours at a time in the dayroom.  He also states that he suffers from "heat exhaustion" in the summer, but does not elaborate.

Armour asserts that the Defendants' "systematic failure to properly investigate the plaintiff(s) administrative remedies is in fact used as a form of retaliation and an attempt to deter the plaintiff(s) from seeking any remedy for his living conditions."  He refers to grievances purporting to show a conspiracy to inflict emotional distress as well as cruel and unusual punishment.

After again contending that the Defendants are liable for intentional infliction of emotional distress, Armour argues that the Defendants have a legal responsibility to use due care to insure that plaintiff(s) are properly housed and not subjected to despicable and inhumane living conditions.  He claims their failure to do so subjects them to liability for negligence.

Armour then refers to TDCJ Administrative Directive 10.20, which he says requires that facilities including the TDCJ units be maintained in proper order.  He contends that the Defendants are in violation of this directive.  Armour further states that the Defendants are in violation of policies requiring out of cell time for inmates in general population as well as ethical policies and policies governing employee conduct.  He complains that unit grievance investigators are covering up the violations of the Constitution and TDCJ policies, which he claims violates his First Amendment rights.  The Defendants have ignored notifications from plaintiff(s) and others, and/or have reported deliberate false information in the course of responding, or have used biased unit grievance investigations which give meaningless boilerplate responses to the grievances.  Because the Defendants have violated these policies, Armour argues that they are not entitled to qualified immunity because they ignore existing law.  For relief, Armour seeks a declaratory judgment, compensatory and punitive damages, and injunctive relief.

### III. The Defendants' Motion for Summary Judgment

The Defendants argue that Armour's claims under the Texas Tort Claims Act lack merit because the Act does not waive immunity for intentional torts in federal court. They contend that Armour's claims against them lack merit because there is no showing of personal involvement and there is no *respondeat superior* liability under §1983.

The Defendants also argue that Armour fails to meet the objective and subjective components required to set out an unconstitutional conditions of confinement claim. They invoke their entitlement to qualified and Eleventh Amendment immunity. Finally, the Defendants argue that Armour's request for class certification should be denied because he has not met the criteria of Rule 23.

#### A. The Defendants' Summary Judgment Evidence

In Step One grievance no. 2017065559 (docket no. 36-1, p. 7), signed December 31, 2016, Armour complains that he is being double-celled and it is stressful to be confined in close quarters with another inmate. The response to the grievance, from Warden Richardson, states that the Classification Department says that Armour's housing is appropriate.

In Step One grievance no. 2017076886 (docket no. 36-1, p. 14), signed January 2, 2017, Armour complains of the totality of his living conditions, including double-celling, sleep deprivation, no toilets in the dayroom and rec yard, overcrowded showers, and extreme heat. The response to the grievance told Armour to present only one issue per grievance and that staff reports that the showers are being conducted properly. In his Step Two appeal of this grievance (docket no. 36-1, p. 12), Armour claims that the single issue presented in his grievance is "the totality of my confinement." The response to the grievance says that the Coffield Unit received a waiver from the American Correctional Association as the unit was built prior to the 1986 prototype facilities.

A memo to the grievance department from the risk management department (docket no. 36-1, p. 21) says that the Coffield Unit was built in 1972 and does not provide 35 square feet of unencumbered space per occupant as required in the 1986 Michael Unit-style prototype facilities.

This is a non-mandatory ACA standard and has been mitigated by allowing inmates to exit their cells daily for such activities as showers and recreation.  The unit monitors temperature and inmates who are sensitive to temperature extremes are housed in accordance with their HS-18 screen (i.e. their health summary for classification form).

In Step One grievance no. 2017144872 (docket no. 36-1, p. 25), signed on May 29, 2017, Armour complains that there are no toilets in the dayroom or on the rec yards and that he has been repeatedly denied access to a toilet while stuck in the dayroom for hours at a time.  He asked that toilets be installed in the dayroom.  The response to this grievance stated that hourly ingress and egress are conducted to allow all offenders to enter their cells to use the restroom, and that the Coffield Unit's design cannot be changed.

In his Step Two appeal of this grievance, Armour said he was not requesting for the design to be changed, but only for toilets to be installed in the dayrooms.  He stated this would not be necessary if cells were reserved on One and Three Row for use as toilets or if ingress and egress were done properly.  He contends that "Warden Cooper knows that the doors are not rolled for two or three hours at a time."  The response to this grievance appeal says that a review of the Step One grievance was conducted and Armour was appropriately advised at the unit level.

In Step One grievance no. 2017151268 (docket no. 36-1, p. 33), signed on June 8, 2017, Armour complains that the showers are routinely packed with 100 or more inmates even though there are only about 60 shower heads.  There are no capacity signs in the showers, and there is no place for prisoners to put clean clothes while drying off and changing except for the floor.  The response to this grievance stated there are 78 shower heads in the B side area and prisoners are put in the showers 75 at a time.  Ample time is given to shower before another group is brought in, so the showers are at no time overcrowded.

In his Step Two appeal of this grievance (docket no. 36-1, p. 31), Armour contends that "it appears that someone has told the warden something that is not true."  He states that an operations review will reveal how many people are placed in the shower at one time as well as how many exit

at one time.  There are not 78 usable, working showers in the shower area and men are packed in the shower like "cattle in a dip."  He asks that the warden come to the shower unannounced and says that the answer to the grievance reflects what is on paper, but at Coffield, what is on paper and what is reality are two different things.  The response to this grievance appeal states that an investigation was conducted and Armour was appropriately advised at the Step One level, and there is insufficient evidence to indicate the staff is overcrowding the capacity of the shower.

In Step One grievance no. 2017168377 (docket no. 36-1, p. 43), Armour again complains of the lack of toilets in the dayroom.  He says he has requested that Warden Cooper reserve cells on One and Three Row to be used until toilets can be installed in the dayrooms, but Cooper has failed even to address his I-60 requests.  The response to this grievance stated that due to the design of the original unit, such changes cannot be made as requested, and only modifications and improvements are continued through the years.

Armour filed a Step Two appeal of this grievance (docket no. 36-1, p. 41) saying that the response he received was incomprehensible because it says that modifications cannot be made, but then says modifications and improvements are continued through the years.  Even if modifications cannot be made, he asks what prevents cells on One and Three Row for being reserved as toilets.  He contends this request is within reason since inmates are forced to stay in the dayrooms for two to four hours without the doors being rolled.  The response to this grievance appeal states that the Step One response was incorrect.  Ingress and egress are conducted by security staff which allows inmates to have access to the restroom when necessary.  The response also says "the design of the Coffield Unit was build in 1965 and the changes to the unit cannot be modified by the unit maintenance, it can only be modified and approved through Huntsville Headquarters.  No further action is warranted."

In grievance no. 2017183701 (docket no. 36-1, p. 52), signed on August 3, 2017, Armour complains that after years of requesting oscillating fans to be placed in the dayroom, finally a stationary fan has been mounted in each dayroom.  However, these fans serve little or no purpose

because they only blow the hot air and there is no oscillation to circulate the air, nor is there an exhaust.  The temperature is always above 85 degrees and most of the time is nearly 100.  Armour further says that the "so-called respite areas" are no good because "neither the guards nor the rank will allow you to use them."  The response to this grievance states that the risk management department has advised that fans have been provided for each dayroom and there is cool water available as needed as well as respite areas and showers.  There is insufficient evidence to indicate the Coffield Unit Administration has failed to address the heat concerns.

In his Step Two appeal of this grievance, Armour complains that the TDCJ administration "places the health of hogs above that of humans."  He says the State has a policy requiring cool air ventilators in the hog barns and the barns have generators which automatically turn on when the temperature goes above 74 degrees, and argues that "humans deserve similar treatment."  The response to this grievance states that a review of the Step One grievance was conducted and Armour was appropriately advised at the unit level.

A memo to the grievance department from Lt. Matthews, dated August 8, 2017 (docket no. 36-1, p. 58), states that "an adequate amount of fans are provided to all offenders in the housing areas.  Fans are provided in the dayrooms and also provided on each of the housing area runs.  Fans are also provided for the offenders and staff in the housing area hallways and main hallways throughout the main building."

The heat directive from 2016 (docket no. 36-2, p. 3) states that each employee must review Administrative Directive 10.64, concerning extreme temperature conditions, as well as Correctional Managed Health Care Policy D-27.2 concerning heat stress.  Employee information cards including tips for recognition, treatment, and prevention of heat-related illnesses are available for units to order from the prison store.

The directive states that on March 24, 2016, staff from various divisions and departments met to review precautions from the previous summer and discuss actions for the next summer.  The directive gave a lengthy list of instructions concerning such categories as wellness checks and

respite areas as well as precautions and actions related to training, inmate transport, outside activity, offender intake, offender housing assignments, offender housing areas, offender fans, and maintenance.  The precautions and actions related to fans and housing areas specified that water and cups must be available at all times, officers should ensure that each inmate has a cup and one will be provided if not, additional water including ice should be provided to employees and inmates in the housing areas, inmates should have access to cold water showers, including additional showers when feasible, inmates would be allowed to wear T-shirts and shorts in the dayrooms and recreation areas, air flow should be increased by using blowers and air should be exhausted outside, and posters should be placed in housing areas reminding inmates of the importance of heat precautions and the importance of water intake.  Inmate fans cannot be confiscated due to property restrictions, but only if altered or stolen, all inmates may purchase a fan if they do not already have one, fans are allowed to all custody levels including administration segregation and disciplinary status, and fan programs to insure that indigent offenders receive fans (on a first come first serve basis).  Inmates with significant medical needs, based on conditions which are negatively impacted by heat, have priority.

On June 14, 2016, TDCJ-CID Director Davis sent an email to the deputy directors, regional directors, wardens, and a number of other individuals containing a reminder about the heat directive (docket no. 36-2, p. 29).  The email requested that the recipients review the precautions and actions to be taken and instructed units to: (1) ensure staff is trained to recognize the effects of heat-related illnesses; (2) enure all employees have employee information cards; (3) place heat posters in housing areas reminding inmates of heat precautions and the importance of water intake; (4) restrict outside activity and recreation, and provide staff and inmates working in the heat with frequent water breaks; (5) provide additional water and cups in dorms and housing areas and during mealtimes, along with ice if possible; (6) allow inmates to wear shorts and T-shirts in dayrooms and recreational areas; (7) allow inmates access to respite areas in late afternoon and early evening hours or more frequently if necessary; (8) allow additional showers when possible, and lower the temperature for single temperature showers; (9) ensure maintenance of fans, blowers, and showers in housing areas;

13

(10) allow fans for inmates in all custody levels, ensuring the fan program is in place for issue of fans to indigent prisoners on a first come first served basis; (11) inpatient psychiatric offenders should be transported only by air-conditioned vehicles; and (12) inmates should be transported during the coolest hours of the day if possible.  If an staff member or inmate requires emergency treatment for a heat-related illness, the medical department and unit risk manager must be notified, and if there is no on-site medical staff, 9-1-1 must be called.  Temperature-related incidents and injuries must be reported to the Emergency Action Center.

A heat directive dated April 7, 2017 (docket no. 36-2, p. 39) contains much of the same information as previous directives, adding the information that fans, cooling towels, and electrolyte drink mixes are available from the commissary.  The food service and maintenance departments were directed to ensure that ice machines are working properly and all necessary preventative maintenance has been completed, and preventative maintenance to blowers, fans, and evaporative coolers has been done as well.

An email that same date, from a person named Stephanie Hightower, Program Supervisor I for Plans and Operations (docket no. 36-2, p. 51) states that heat training for inmates and employees must be completed during the month of April.  Training videos for inmates and employees are in production.  During extreme temperatures, staff can bring in unlimited quantities of water and/or electrolyte drinks into the unit.  Staff and inmates are encouraged to drink 16 ounces of water per hour when the temperature exceeds 90 degrees, and to avoid sugary or caffeinated drinks which contribute to dehydration.  Inmates will receive the Heat, Cold, Safe Prisons / PREA and Suicide Prevention flyer, training on heat-related illness and precautions, and watch the heat-related illness video.  Water and cups will be made available.  A copy of the flyer appears at docket no. 36-2, p. 59.  Hightower sent out a heat directive reminder on June 1, 2017 (docket no. 36-2, p. 69).  A "Seasonal Preparedness Directive" was issued in February of 2018, followed by reminders (docket no. 36-2, pp. 84, 88, 95) reiterating the precautions previously discussed.  Similar directives and reminders were issued in 2019 (docket no. 36-2, pp. 103, 106, 118).

Administrative Directive 10.64 (docket no. 36-3, p. 3) provides that before inmates may be required to work in excessive or extreme temperature conditions, the warden and applicable department supervisors shall ensure that appropriate measures are taken to prevent temperature-related injuries, including consulting with medical staff.  The unit staff is to monitor the temperature, including the heat index or wind chill, and announce this over the radio every hour between 12:30 a.m. and 11:30 p.m.  The outside air temperature, humidity or wind speed, and heat index or wind chill is to be documented 24 hours a day on the temperature log.

Clothing considered appropriate for inmates working in cold weather includes thermal underwear, insulated jackets, cotton or leather gloves, insulated hoods, work shoes, and socks.  The wind chill index is used to determine the need for insulated hoods and leather gloves, although appropriate clothing will be issued even when the wind chill index indicates little danger of exposure injury.  The directive goes on to discuss the symptoms of hypothermia.

Turning to excessive heat, the directive states that guidelines to assist the warden in determining that an excessive heat condition exists are found in the heat and humidity index.  If the National Weather Service issues an excessive heat warning or notice of an impending heat wave, the TDCJ Office of Incident Management sends an email notification to the division directors.  If excessive heat conditions last over three days, the division directors and wardens in the affected areas shall  implement additional precautionary measures.  Medical staff are to be consulted before exposing inmates to excessive heat conditions in work areas, including indoor work areas such as boiler rooms.  In addition, hazards posed by UV radiation such as sunburn shall be monitored, and inmates will be provided with protective clothing for the hazards posed by UV radiation.

Drinking water and cups shall always be available in inmates in conditions of excessive heat.  Cups will be provided for indigent and newly received inmates.  High water intake is encouraged during periods of excessive heat and inmates and staff working in air temperatures above 90 degrees should drink 16 ounces of fluid per hour.

The prison staff and medical staff are to work together to identify inmates susceptible to heat-related illnesses due to medical conditions.  Inmates being treated with diuretics or medications which inhibit sweating require special medical evaluation before being assigned to work in excessive heat.

Before April 15 of each year, the directive specifies that wardens shall review with unit staff the status of shower temperatures, fans, ice machines, ventilation systems, exhaust fans, and respite areas throughout the unit.  The warden shall coordinate with the unit maintenance staff to address any deficiencies.  Inmates will be assessed for such restrictions as no work in direct sunlight and no temperature extremes.  A medical heat restriction list shall be kept to indicate inmates who are susceptible to temperature-related illness due to temperature conditions.  Work assignments shall be no more than four hours until the inmate becomes acclimated to the weather conditions, and appropriate clothing will be worn at all times.

Inmates shall be allowed access to respite areas during periods of excessive heat and may request access to a respite area 24 hours a day, even if not feeling ill at the time of the request.  An inmate seeking access to a respite area is not required to be seen by medical staff unless exhibiting signs and symptoms of a heat-related illness, and may stay in the respite area as long as necessary. Any area with air conditioning may be used for respite, as determined by the warden, and the warden or designee shall determine the order of use for respite areas, ensuring that those areas capable of accommodating the greatest number of inmates are utilized first, while maintaining the safety and security of the unit.  Inmates cannot choose the respite area to which they have access.

In situations where the heat index is above 90 degrees, the directive provides that units will initiate the following steps: (1) provide additional water and cups in dorms, housing areas, recreational areas, and during meal times, along with ice; (2) transport in-patient psychiatric inmates via air-conditioned transfer vehicles; (3) transport inmates during the coolest hours of the day if possible; (4) allow inmates to use and carry cooling towels; (5) allow inmates to wear shorts and T-shirts in dayrooms and recreational areas; (6) ensure maintenance of fans, blowers, and showers; (7)

ensure that all staff have employee information cards; (8) allow additional showers when possible and lower the water temperature for single temperature showers; (9) put up posters reminding inmates of heat precautions and the importance of water intake; and (10) allow fans for inmates of all custody levels, insure a fan program is in place for indigent prisoners and providing that fans may only be confiscated if altered or stolen.

When excessive heat conditions last longer than three days, the directive instructs the warden to instruct staff to implement the following measures: (1) initiate the incident command system (ICS) and notify the appropriate regional director and deputy director for prison and jail operations of impending heat conditions; (2) restrict and possibly cancel outside work and recreation; (3) reduce kitchen and dish room operations as needed, and prisoners can be served cold cuts and other food items which do not require heating, as conditions warrant; and (4) permit prisoners to purchase electrolyte sports drinks without affecting their spending limits.  The ICS may be deactivated when the conditions giving rise to the excessive heat warning cease, with the approval of the regional director.  After the ICS is deactivated, a debriefing shall be conducted to evaluate unit operations during the excessive heat warnings.

The directive provides for emergency medical treatment of inmates requesting medical care or exhibiting signs of illness during periods of extreme temperature.  The medical staff and unit risk manager will be notified of any temperature-related incidents or injuries.  Annual training for staff and inmates shall be conducted, using a training program developed by the University of Texas Medical Branch Clinical Education Department, and additional training may be provided as well.

Armour's classification records attached to the motion for summary judgment had no records for disciplinary action, unit incident reports, or serious incident reviews from January of 2017 until May of 2019.  His health summary for classification form dated December 5, 2018 shows that he has a lower bunk restriction as well as restrictions against working in direct sunlight and extreme temperatures.

**IV. Armour's Response to the Motion for Summary Judgment**

In his response, Armour says that the Human Rights Report from the University of Texas, as well as the letters and grievances already before the Court, meet and surpass the requirements for setting out an unconstitutional conditions of confinement claim. He also refers to "four hundred affidavits," although these are not in the record. Armour states he has included grievances and letters which are attached to his original complaint and asserts that the grievance officers at the Coffield Unit have taken steps to prevent exhaustion. Armour complains that the summary judgment evidence provided by the Defendants consists largely of his medical records; however, there are no medical records attached to the Defendants' motion.

Armour contends that a review of grievances over the past five years would reveal that the Defendants have participated directly and failed to remedy the wrong after it was reported, and/or created a policy or custom under which unconstitutional practices occurred. He further contends that TDCJ agency policies rebut any defense of qualified or other types of immunity. Likewise, he asserts that TDCJ officials claim any affirmative defenses because TDCJ has a long history of ignoring court orders. He attaches a newspaper article purporting to show TDCJ's contempt of a court order.

Armour next asks the Court to consider the evidence in <u>Cole v. Livingston</u>, 2016 WL 3258345 (S.D.Tex., June 14, 2016), a case concerning the conditions of confinement at the Pack Unit. He claims that in that case, it was established that the violations taking place at the Pack Unit are systemic throughout TDCJ.[1]

Armour contends that the Defendants have offered no evidence in support of their motion for summary judgment, describing the summary judgment evidence attached to the Defendants' motion as "irrelevant." He argues that the water should be tested at the Coffield Unit and says that

---

[1]In <u>Cole</u>, the district court certified a class action for a general class and two sub-classes, consisting of the inmates who are or will be at the Pack Unit, inmates with special heat sensitivity, and inmates with disabilities. On appeal, the Fifth Circuit affirmed the certification of the class. <u>Yates v. Collier</u>, 868 F.3d 354, 370 (5th Cir. 2017). Neither the district court nor the Fifth Circuit made any findings to the effect that the alleged violations were "systemic."

production of water tests, videos, and heat logs would allow him to move for summary judgment. He quotes from the Human Rights Report from the University of Texas and speculates that an expert witness could testify to the "prolonged deterioration of organs as a result of continued subjection to stress."

Armour complains that the Defendants state they have no choice but to deprive him of five hours of uninterrupted sleep, but offer no means of operating the unit in a safe manner. He says that he has been on the unit since 1993 and can remember when he could get five hours of sleep, and claims the practice of depriving inmates of sleep has been implemented so as to keep inmates in a "zombie-like state."

Next, Armour contends that although the Defendants claim that ingress and egress is conducted hourly, the reality is different. He states that a visit to the unit and interviews with inmates would show the truth, and a review of video would show that the logs are falsified.

Armour says that the Defendants are simply trying to "pass the buck" as to responsibility for the cleanliness of the prison, complaining that the water at the Pack Unit was determined to have arsenic contamination.

With regard to class certification, Armour claims he never said that he would be able to protect the interests of the class, and this is why he has requested appointment of a special master. He states that he has contacted the Department of Justice to seek their intervention in the lawsuit, but the DOJ has not yet responded to him. He asserts that he has met the requirements of Rule 23 and states that class certification would promote judicial efficiency.

As attachments to his response, Armour includes a newspaper article, purportedly from a publication called the Texas Tribune, saying that TDCJ Director Bryan Collier testified in a court hearing that TDCJ failed to monitor temperatures on units where the agency houses inmates who are supposed to be protected by a settlement agreement covering the Pack Unit.

Armour also attaches four pages, 11, 12, 47, and 48, which are purportedly from a document called the Human Rights Report from the University of Texas. These documents recite from

interviews with inmates about the heat, claim that TDCJ is aware of "inhumane conditions," and sets out the conclusions and recommendations of the unnamed authors of the "report."

The Defendants have filed a motion asking that the article from the Texas Tribune and the excerpted pages from the Human Rights Report be stricken as hearsay.  The Fifth Circuit has stated that newspaper articles are "classic, inadmissible hearsay" and cannot be used to defeat summary judgment.  Roberts v. City of Shreveport, 397 F.3d 287, 295 (5th Cir. 2005).  Like Armour's newspaper article, the purported excerpt from the Human Rights Report is hearsay because it is not sworn or certified and the authors are not subject to cross-examination.  See Hicks v. Charles Pfizer & Company, Inc., 466 F.Supp.2d 799, 795 (E.D.Tex. 2005).  The Defendants are correct in their assertion that these exhibits are hearsay and are not competent summary judgment evidence.

## V. Discussion

### A. Overcrowding

Armour contends that double-celling inmates in a 45 square foot cell for 24 hours a day for weeks at a time is cruel and unusual punishment, as set out in Ruiz v. Estelle, 679 F.3d 1115 (5th Cir. 1982), *modified in other respects* 688 F.2d 266 (5th Cir. 1982).  In fact, however, the Fifth Circuit vacated the district court's holding that double-celling was cruel and unusual punishment. Id. at 1148, 1150-51, 1165.

The Supreme Court has specifically held that the double-celling of prisoners, even in relatively small cells, does not amount to cruel and unusual punishment.  Rhodes v. Chapman, 452 U.S. 337, 347–50, 101 S.Ct. 2392, 69 L.Ed.2d 58 (1981); *see also* Duncan v. Puckett, 91 F.3d 137, 1996 U.S. App. LEXIS 44395, 1996 WL 400039 (5th Cir., May 27, 1996) (upholding dismissal as frivolous of inmate's complaint of being placed in a single cell with another prisoner); Lineberry v. U.S., civil action no. 5:08cv72, 2009 U.S. Dist. LEXIS 15293, 2009 WL 499763 (E.D.Tex., February 27, 2009, *appeal dismissed as frivolous* 436 F.App'x 293, 2010 U.S. App. LEXIS 11269, 2010 WL 7114190 (5th Cir., June 3, 2010) (rejecting complaint of double-celling at the Federal Correctional Institution at Texarkana); Barber v. Quarterman, civil action no. 6:09cv238, 2010 U.S.

Dist. LEXIS 33349, 2010 WL 1417650 (E.D. Tex., Apr. 5, 2010), *appeal dismissed* 437 F.App'x 302, 2011 U.S. App. LEXIS 16111, 2011 WL 3313211 (5th Cir., August 3, 2011) (citing Parker v. Currie, 359 F.App'x 488, 2010 U.S. App. LEXIS 92, 2010 WL 10924 (5th Cir. Jan. 4, 2010) (inmate desired a single cell but was assigned to general population, where he was double-celled; no constitutional liberty interest infringed)).

The Fifth Circuit has stated that overcrowding of persons in custody is not *per se* unconstitutional. Collins v. Ainsworth, 382 F.3d 529, 540 (5th Cir. 2004), *citing* Rhodes, 452 U.S. at 347-50. While Armour's pleadings may depict an environment which is uncomfortable, unpleasant, and stressful, he has not shown it is one which is unconstitutional. McClure v. TDCJ-CID, civil action no. 5:10cv66, 2011 U.S. Dist. LEXIS 20560, 2011 WL 806227 (E.D.Tex., January 31, 2011), *Report adopted at* 2011 U.S. Dist. LEXIS 20551, 2011 WL 773290 (E.D.Tex., March 1, 2011), *aff'd* 459 F.App'x 348, 2012 U.S. App. LEXIS 1232, 2012 WL 177369 (5th Cir., January 20, 2012); *see also* Cupit v. Jones, 835 F.2d 82, 84 (5th Cir. 1987) (no right to a stress-free environment while incarcerated). This claim is without merit.

Armour also complains of overcrowding in the showers, saying that over 100 men are put in a shower containing only 60 shower heads. He contends that this condition increases exposure to disease and violence, but does not allege that he has suffered any disease or other harm as a result.

Overcrowded showers are not *per se* a constitutional violation. Hazel v. Bell, civil action no. 9:08cv216, 2010 U.S. Dist. LEXIS 26267, 2010 WL 1038743 (E.D.Tex., January 8, 2010), *Report adopted at* 2010 U.S. Dist. LEXIS 26238, 2010 WL 1038733 (E.D.Tex., March 18, 2010), *citing* Rhodes, 452 U.S. at 347. The mere generalized knowledge that some prisoners may be dangerous is not enough to support a finding of deliberate indifference; even general knowledge about a particular inmate's violent tendencies, without more specific information about the risk, does not rise to the requisite level of awareness necessary for a finding of deliberate indifference. Van Williams v. Samaniego, civil action no. EP-05-CA-491, 2007 WL 9701460 (W.D.Tex., February 22, 2007), *citing* Carter v. Galloway, 352 F.3d 1346, 1349-50 (11th Cir. 2003). Armour's

generalized and inchoate allegations of possible danger are insufficient to show that the Defendants are acting with deliberate indifference to his safety.  Furthermore, Armour did not allege an injury as a result of shower overcrowding and thus cannot prevail on this claim.  *See* Davis v. Scott, 157 F.3d 1003, 1006 (5th Cir. 1998). His claim on this point is without merit.

B. Sanitation

Armour complains that sanitation in the chow hall is "despicable and deplorable,"  alleging that the eating utensils, cups, and trays are not properly cleaned, there are flies, insects, and birds in the chow hall and kitchen, and the ceiling leaks and there is standing water in the floor in the chow hall.  He says he "has been told" that food contaminated with bird droppings is served to prisoners, but he does not state who told him this or that he has ever found bird droppings in food. Armour says, without elaboration, that "plaintiff(s) has become ill on several occasions after eating in the chow hall."

Although prisons should be reasonably clean, "[t]he Constitution does not require that prisons be completely sanitized or as clean or free from potential hazards as one's home might be." McAllister v. Strain, civil action no. 09-2823, 2009 U.S. Dist. LEXIS 120097, 2009 WL 5178316 (E.D. La. Dec. 23, 2009); *see also* Talib v. Gilley, 138 F.3d 211, 215 (5th Cir.1998) ("[T]he Constitution does not mandate prisons with comfortable surroundings or commodious conditions."); Wilson v. Lynaugh, 878 F.2d at 849 & n.5 (noting that the Constitution does not protect prisoners from "discomfort and inconvenience" and that prisoners "cannot expect the amenities, conveniences, and services of a good hotel.")  With regard to food service, prisons are required to provide "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Brown v. Canteen, Inc., civil action no. 09cv1549, 2009 U.S. Dist. LEXIS 112677, 2009 WL 4506867 (W.D. La. Dec. 3, 2009), *Report adopted* December 3, 2009 (docket no. 14), (*quoting* French v. Owens, 777 F.2d 1250, 1255 (7th Cir. 1985), *cert. denied*, 479 U.S. 817 (1986)); Green v. Ferrell, 801 F.2d 765 (5th Cir. 1986); Smith v. Sullivan, 553 F.2d 373, 380 (5th Cir. 1977).

The courts have held that without an allegation of resulting harm, complaints regarding food service practices "simply are not of a constitutional dimension," even where the plaintiff is requesting injunctive relief.  In this case, Armour does not make any specific allegations that he has ever suffered harm or illness as a result of these allegedly unsanitary conditions beyond the general assertion that "plaintiff(s) has become ill on several occasions after eating in the chow hall."  This is not sufficient.  Encalade v. Stacks, civil action no. 9:04cv214, 2006 U.S. Dist. LEXIS 40945, 2006 WL 1582468 (E.D. Tex. May 30, 2006), *appeal dismissed* (rejecting claim of unsanitary food service and procedures where inmate failed to show anything more than a general complaint that his stomach hurt); *see also* Flowers v. Dent, 21 F.3d 1109, 1994 U.S. App. LEXIS 41118, 1994 WL 171707 (5th Cir., Apr. 29, 1994) (affirming dismissal as frivolous of complaint asserting that inmate did not receive adequate food and the kitchen facilities were unsanitary, where no harm was shown); Northup v. Bell, civil action no. 6:11cv222, 2012 U.S. Dist. LEXIS 95060, 2012 WL 2814307 (E.D. Tex. June 12, 2012), *Report adopted at* 2012 U.S. Dist. LEXIS 95069, 2012 WL 2813973 (E.D.Tex., July 9, 2012).

In Groves v. Gusman, civil action no. 09-7431, 2-11 U.S. Dist. LEXIS 41493, 2011 WL 1459775 (E.D. La., Mar. 4, 2011), *Report adopted at* 2011 U.S. Dist. LEXIS 4154, 2011 WL 1463612 (E.D. La., Apr. 15, 2011) the district court held that "a minor sanitation restriction or problem, although admittedly unpleasant, does not amount to a constitutional violation," particularly where inmate alleged no harm.  *See also* Jackson v. Griffith, civil action no. 1:93cv424, 1995 U.S. Dist. LEXIS 516, 1995 WL 21939 (E.D.Tex. Jan. 10, 1995), *Report adopted at* 1995 U.S. Dist. LEXIS 22831, 1995 WL 313655 (E.D .Tex. Feb. 8, 1995) (claim regarding unsanitary food trays resulting from overcrowded conditions dismissed as frivolous).

In addition, mere negligence on the part of the prison officials in the way they manage the food services does not amount to a constitutional violation.  Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir.1993).  Armour has not set out a constitutional claim and his complaint in this regard is without merit.

Armour similarly complains that "many cells" are infested with cockroaches, ants, spiders, and birds.  The Coffield Unit is located in rural East Texas, where such creatures are a fact of life. The courts have held that the presence of pests, by itself, is not a constitutional violation.  *See* Morrison v. Bench, civil action no. 3:09cv1003, 2009 U.S. Dist. LEXIS 116515, 2009 WL 4858066 (N.D.Tex., December 14, 2009) (claim was frivolous where prisoner was placed in solitary confinement and required to relocate to cells at the end of the building which were infested with bugs and mosquitos); Bush v. Monroe, civil action no. 6:17cv541, 2018 U.S. Dist. LEXIS 145428 (E.D.Tex., July 30, 2018), *Report adopted at* 2018 U.S. Dist. LEXIS 144167, 2018 WL 4042418 (E.D.Tex., August 24, 2018) (living in a leaky cell with insects, broken doors, and rust may be undesirable and uncomfortable but is not itself a constitutional violation, citing Rhodes and Wilson v. Lynaugh); Fountain v. Rupert, civil action no. 6:15cv100, 2018 U.S. Dist. LEXIS 155480 (E.D.Tex., August 6, 2018), *Report adopted at* 2018 U.S. Dist. LEXIS 155060, 2018 WL 4346645 (E.D.Tex., September 12, 2018) (dismissing claim that plaintiff was held in bug-infested cells, absent any specific facts, connection of those conditions to actions by the Defendants, or any showing of harm);  Waller v. Ward, civil action no. 3:16cv1168, 2016 U.S. Dist. LEXIS 173161, 2016 WL 7235832 (W.D.La., October 19, 2016), *Report adopted at* 2016 U.S. Dist. LEXIS 173154, 2016 WL 7240152 (W.D.La., December 14, 2016) (mere presence of pests does not amount to a constitutional violation, collecting cases).  Armour has not shown a constitutional violation, particularly in light of the fact that he does not allege that he has lived in a cell infested with pests or that he has suffered harm as a result.  His claim on this point is without merit.

Armour also contends that there is no toilet, but only one urinal, in the dayrooms.  He asserts that the doors are not opened for "hours at a time," and it is not unusual for a prisoner to defecate and throw it out the window, or for an older prisoner on medication to defecate on himself.  His grievances, as well as the responses to these grievances, make clear that TDCJ policy calls for ingress and egress from the dayroom every hour, but Armour argues that this policy is not followed and ingress and egress is not allowed for several hours at a time.

Armour does not allege, much less show, that any of the named Defendants are personally responsible for what he claims is the failure to follow TDCJ policy.  He does not sue the officers who actually man the doors and allegedly fail to open them every hour as he acknowledges that policy requires.   The named Defendants are not vicariously liable for the actions of their subordinates.  Thompson v. Upshur County, 245 F.3d 447, 459 (5th Cir. 2001).  This claim is without merit.

C. Sleep

Armour complains that he is denied five hours of uninterrupted sleep, which he says is "intentionally caused by and through the count policy, mail, lay-ins, pill-window, and with the breakfast and shower schedules."  He also complains that announcements are made several times a night over the loudspeakers and that bells ring at count time, which occurs at least three times during the night.

Armour states that responses to grievances on this issue have been answered by saying that breakfast begins at 3:00 a.m., but this is false because the chow is "dropped to the dayroom" around 2:30 a.m.  He claims this means if he wants to go to breakfast, he must get up at 2:00 a.m., although he does not explain what "dropped to the dayroom" means or why it would take a half hour or more to get ready to go to breakfast.  He also says that if he goes to breakfast at the first "wing drop," he may not get back to his bunk until 3:45.

In Walker v. Nunn, 456 F.App'x 419, 2011 U.S. App. LEXIS 26073, 2011 WL 6934496 (5th Cir. 2011), the plaintiff Stephen Walker complained that he was denied adequate sleep while confined in TDCJ, based in part on the prison schedule of operations.  The evidence showed that the prison unit had to operate on a 24-hour basis in order to perform the tasks required to keep the prison functioning.  The Fifth Circuit held that the structure of the prison schedule was reasonably related to legitimate penological interests and determined that there was no Eighth Amendment violation.  The court also held that while the prisoner sued supervisory officials complaining of policies of depriving prisoners of sleep and ignoring staff misconduct, no evidence was offered of such policies.

*See also* <u>Chavarria v. Stacks</u>, 102 F.App'x 433, 2004 U.S. App. LEXIS 14945, 2004 WL 1485076 (5th Cir., July 20, 2004) (lights illuminating the plaintiff's cell 24 hours a day, making it impossible for him to sleep, did not set out an Eighth Amendment violation because he did not show that the claimed deprivation was unnecessary and wanton).

The Eighth Amendment forbids the infliction of cruel and unusual punishment. The indicia of confinement constituting cruel and unusual punishment include wanton and unnecessary infliction of pain, conditions grossly disproportionate to the severity of the crime warranting imprisonment, and the deprivation of the minimal civilized measures of life's necessities. <u>Wilson v. Lynaugh</u>, 878 F.2d 846, 848 (5th Cir.), *cert. denied* 493 U.S. 969 (1989). The Supreme Court has held, however, that to the extent that prison conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346-47, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Similarly, the Fifth Circuit has stated that the Eighth Amendment does not afford protection against mere discomfort or inconvenience. <u>Wilson</u>, 878 F.2d at 849.

The infliction of punishment involves a culpable state of mind. The Supreme Court has explained that "the infliction of punishment is a deliberate act meant to chastise or deter. This is what the word means today; it is what it meant in the eighteenth century.... [I]f [a] guard accidentally stepped on a prisoner's toe and broke it, this would not be punishment in anything remotely like the accepted meaning of the word, whether we consult the usage of 1791, or 1868, or 1985." <u>Wilson v. Seiter</u>, 501 U.S. 294, 111 S.Ct. 2321, 2325 (1991), *citing* <u>Duckworth v. Franzen</u>, 780 F.2d 645, 652 (7th Cir. 1985), *cert. denied*, 479 U.S. 816 (1986).

In <u>Garrett v. Thaler</u>, 560 F.App'x 375, 2014 U.S. App. LEXIS 5987, 2014 WL 1282619 (5th Cir., April 1, 2014), the Fifth Circuit stated that sleep deprivation could potentially constitute a viable Eighth Amendment claim because sleep amounts to one of life's basic necessities. In so holding, the Fifth Circuit pointed out that "we emphasize that we do not more than determine that

Garrett has alleged a non-frivolous claim of an Eighth Amendment violation.  We do not intimate that Garrett has established a claim upon which relief can be granted."

In the present case, by contrast, Armour has failed to state a claim with regard to an Eighth Amendment violation because he does not allege a culpable state of mind on the part of any of the Defendants, beyond the conclusory allegation that the Defendants acted "intentionally."  Even taking his allegations as true, he offers nothing to suggest that the sleep disturbances of which he complains are done in an unnecessary or wanton manner in order to prevent him from sleeping rather than resulting from activities necessary to keep a community of almost 4,000 persons functioning.  The Coffield Unit is the largest single unit in the Texas prison system, with a maximum capacity of 3,818 inmates plus another 321 in the trusty camp.  *See* http://www.tdcj.state.tx.us/unit_directory/co.html. As in Walker v. Nunn, which involved the much smaller Jordan Unit, a 24 hour operation schedule is necessary to keep the prison functioning, and it is not clear how these operations could be eliminated without a large-scale disruption if not a complete revamping of the operations of the prison.  Armour's claim on this point is without merit.

### D. Understaffing

Armour asserts that the prison is understaffed because there is only one officer per wing, and occasionally only one officer for two wings.  He does not show any harm resulting from this, but says that it contributes to his anxiety.

The fact that there are fewer guards on the wing than Armour believes appropriate is not itself a constitutional violation.  Morgan v. Cabana, civil action no. 1:07cv1121, 2009 U.S. Dist. LEXIS 37473, 2009 WL 1066294 (S.D.Miss., April 21, 2009) (general allegations that defendant jail officials failed to protect the plaintiff because the jail was overcrowded and the facility was understaffed , creating conditions that made an attack by other inmates more likely, did not state a constitutional claim for deliberate indifference to the plaintiff's safety); Hinojosa v. Johnson, 277 F.App'x 370, 2008 U.S. App. LEXIS 9542 (5th Cir., May 1, 2008) (affirming dismissal of understaffing claim against supervisory defendants because there was no evidence that: the

defendants affirmatively participated in any unconstitutional acts or implemented a policy of understaffing, that the defendants were aware that the understaffing produced a substantial risk of harm; or that the defendants filed to take or could have taken reasonable steps in an attempt to rectify the problem).

As in <u>Hinojosa</u>, Armour has not shown any involvement on the part of the Defendants with the alleged understaffing.  The mere fact of understaffing, without more, is not proof of official policy.  <u>Hood v. Itawamba</u>, 819 F.Supp. 556, 566 (N.D.Miss.1993); <u>Gagne v. City of Galveston</u>, 671 F.Supp. 1130, 1135 (S.D.Tex.1987), *aff'd* 851 F.2d 359 (5th Cir.1988). In <u>Gagne</u>, the district court observed that evidence of understaffing would become proof of official policy only if more complete funding and staffing were available and it was the intent of the policy-making official not to adequately fund and staff the prison.  <u>Gagne</u>, 671 F.Supp. at 1135; accord, <u>Doe v. Sullivan County, Tennessee</u>, 956 F.2d 545, 550 (6th Cir.1992) (evidence of overcrowding or shortage of jailers does not establish a plaintiff's burden in a failure to protect case).  Armour has offered nothing to suggest that the Defendants could have but intentionally did not adequately fund and staff the prison.  In addition, he has not pointed to any harm resulting from the understaffing; although he claims it caused "anxiety and stress," there is no right to a stress-free environment in prison.  <u>Cupit</u>, 835 F.2d at 84. Armour's claim on this point is without merit.

E. Windows and Temperature Extremes

Armour complains that inmates break the windows, leaving broken glass, which can be made into weapons.  He complains that the broken windows are not replaced until December or January, exposing inmates to the cold, and that the unbroken windows are not tinted, allowing the sun to shine directly in to the cells and increasing the heat in the summer.

Armour does not allege that it is a custom or policy of the Defendants to allow broken glass to remain on the floor, where inmates can pick it up and fashion weapons from it.  Nor does he point to any instances in which an inmate actually made a weapon from the broken glass, much less allege that he suffered any harm as a result.  His claim on this point is without merit.

Armour states, and the Court is aware from other cases, that the buildings at the Coffield Unit have thousands of windows as part of their exterior walls, and that many of these are broken out every year.  Although Armour complains that the windows are not replaced until December or January, he offers nothing to suggest that the Defendants have a policy or custom of intentionally delaying replacing the windows.  With hundreds if not thousands of windows broken out every year, Armour's conclusory allegations are insufficient to show that any delay in window replacement is due to deliberate indifference rather than the sheer number of windows requiring replacement or to negligence at worst.  His claim on this point is without merit.

To the extent Armour complains about exposure to excessive temperatures, his claim likewise fails.  The Fifth Circuit has stated that without the requisite proof of both subjective and objective components of an Eighth Amendment violation, merely uncomfortable heat in a prisoner's cell does not reflect a basic human need that the prison has failed to meet and thus is not constitutionally suspect.  Ball v. LeBlanc, 792 F.3d 584, 592 (5th Cir. 2015), citing Woods v. Edwards, 51 F.3d 577, 582 (5th Cir. 1995).  In this case, Armour asserts only that he "constantly sweats" and "is fatigued due to being unable to sleep due to the extreme heat."  This allegation simply shows uncomfortable heat and falls well short of demonstrating the subjective and objective components of an Eighth Amendment violation.

The summary judgment evidence furnished by the Defendants shows that policies have been put into place with regard to the heat, including placement of fans and blowers, the creation of respite areas, provision of additional water and showers, ensuring that indigent inmates have cups and fans, limitations on outside work and activities, and restrictions on transportation of inmates.  Armour does not dispute these policies, although he argues that the fans are not as effective as he would like because they are not oscillating fans.  The Fifth Circuit has endorsed heat mitigation remedies such as allowing inmates access to air conditioned areas during their tier time, allowing access to cool showers at least once a day, providing drinking water and ice at all times, and supplying individual fans.  Ball, 792 F.3d at 599.  Although the Southern District of Texas found

that similar remedial measures did not prevent certification of a class action at the Pack Unit, no such evidence is before this Court, nor has Armour met all of the requirements of class certification under Fed. R. Civ. P. 23.   His conclusory allegations are not sufficient to show an Eighth Amendment violation by the Defendants with regard to heat, and his claim on this  point is without merit.

Armour also complains that the broken windows "exposes plaintiff(s) and others to the cold temperature of winter, along with the wind-blown rain."  This is the sole allegation in his amended complaint concerning exposure to cold temperatures.  He also says that he "seeks relief from extreme heat and cold which affects his high blood pressure causing it to elevate, and arthritis in the winter elevates his pain."  In the response to the Defendants' motion for summary judgment, Armour says only that "plaintiff has been exposed to extreme heat and cold, which is ongoing today."

In Johnson v. Texas Board of Criminal Justice, 281 F.App'x 319, 2008 U.S. App. 12056, 2008 WL 2337324 (5th Cir., June 5, 2008), the plaintiff Alan Johnson contended that the cells and dayrooms do not provide sufficient living space, there is a small number of guards on duty in relation to the number of inmates which presents a threat to his safety, he is subjected to temperature extremes, the ventilation was virtually non-existent, the fire safety is inadequate, he is denied basic hygiene, and the excessive noise causes him to suffer sleep deprivation.  With regard to the claims of extreme temperature, the Fifth Circuit stated as follows:

> Exposure to cold temperatures without adequate protection can constitute an Eighth Amendment violation, *see* Palmer [v. Johnson, 193 F.3d 346 (5th Cir. 1999)] at 352–53, but Johnson's allegations regarding cold were too vague and conclusory to state a claim of a "sufficiently serious" deprivation that denied "the minimal civilized measure of life's necessities." Id. at 352 (*quoting* Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Johnson's allegations regarding extreme heat also failed to state a viable claim. While Johnson alleged that the temperatures were sometimes uncomfortably hot, he did not allege that he suffered from any heat-related injuries despite being subjected to these conditions numerous times; this is not sufficient to state a constitutional claim. *See* Woods v. Edwards, 51 F.3d 577, 581 (5th Cir.1995) (Eighth Amendment claims involving alleged uncomfortably high temperatures in lockdown and aggravation of a sinus condition as a result of the temperature did not survive summary judgment).

Johnson, 281 F.App'x at *2.

As in <u>Johnson</u>, Armour's allegations concerning exposure to temperature extremes are too vague and conclusory to set out a denial of the minimal civilized measure of life's necessities.[2]  As a result, they cannot survive summary judgment.

E. Exercise

Armour asserts that according to TDCJ policy, general population minimum-in offenders are entitled to receive four hours of out-of-cell or outdoor exercise every day, with one hour not to include dayroom time.  Out of cell exercise is supposed to be called at least twice a day, meaning that in a 31 day calendar period, out of cell exercise should be called 62 times.  However, for the period of what Armour describes as "January 16 to 2016," the average amount of out of cell exercise actually allowed was 13 times per month.  He asserts that this is cruel and unusual punishment.

The Fifth Circuit has held that inmates have no protected liberty interest in specific or any particular amount of outdoor recreational opportunities, and the deprivation of exercise is not a *per se* constitutional violation.  <u>Lewis v. Smith</u>, 277 F.3d 1373, 2001 U.S. App. LEXIS 25773, 2001 WL 1485821 (5th Cir., November 13, 2001) (citing <u>Stewart v. Winter</u>, 669 F.2d 328, 336 n.19 (5th Cir. 1982)).  In order to succeed on a claim of denial of exercise, the prisoner must show that the denial adversely affected his health.  <u>Miller v. Carson</u>, 563 F.2d 741, 751 n.12 (5th Cir. 1977); *see* <u>Hernandez v. Velasquez</u>, 522 F.3d 556, 560-61 (5th Cir. 2008) (claim that prisoner was denied outdoor and out of cell exercise for 13 months could not survive summary judgment where there was no showing that prisoner was ever placed "at substantial risk of serious harm.") Armour makes no such showing.  His claim on this point is without merit.

G. Ladders

---

[2]In <u>Walker v. Davis</u>, civil action no. 6:17cv166, 2019 U.S. Dist. LEXIS 54330, 2019 WL 2465298 (E.D.Tex., January 10, 2019), the plaintiff - also a prisoner at the Coffield Unit - alleged that he was issued a jacket and blanket for protection from the cold, but these were not as effective as he wished. *See* <u>Walker</u>, 2019 WL 2465298 at *10-11.  Armour's allegations concerning exposure to the cold are so lacking in specificity that it cannot be determined what, if anything, was done to mitigate the cold, much less offer any facts showing deliberate indifference on the part of the Defendants.

Armour complains that there is no ladder for prisoners to climb up to and down from the top bunk, which is five feet above the floor.  This causes fights between prisoners, because one has to stand on the bottom bunk to reach the shelves, which are seven to eight feet above the floor.  He does not assert that he has to climb up to a top bunk, and the summary judgment evidence shows that he is restricted to lower bunks.  Nor does Armour allege that he has ever been in an altercation as a result of another prisoner having to climb up to the top bunk.

The courts have held that the Constitution does not require that top bunks be provided with ladders.  *See, e.g.*, Grant v. Aubrey Cole Law Enforcement Center, civil action no. 1:09cv772, 2012 U.S. Dist. LEXIS 106482, 2012 WL 3112060 (E.D.Tex., June 26, 2012, *Report adopted at* 2012 U.S. Dist. LEXIS 106481, 2012 WL 3115036 (E.D.Tex., July 31, 2012) (stating that "the Constitution does not require ladders for bunk beds"); Hawthorne v. Cain, civil action no. 10-0528, 2011 U.S. Dist. LEXIS 79681, 2011 WL 2973690 (M.D.La., June 8, 2011, *Report adopted at* 2011 U.S. Dist. LEXIS 79674, 2011 WL 2941308 (M.D.La., July 21, 2011) (failure of prison officials to equip the bunk with a ladder "simply does not amount to the deprivation of a minimal civilized measure of life's necessities"); Connolly v. County of Suffolk, 533 F.Supp.2d 236, 241 (D.Mass. 2008, no appeal taken) (same).  In Armstrong v. Terrebone Parish Sheriff, civil action no. 06-573, 2006 WL 1968887 (E.D.La., June 6, 2006), the Eastern District of Louisiana concluded that a swivel chair was a reasonable means by which an inmate could get into the top bunk, noting that "the Constitution requires neither ladders for bunk beds nor call boxes to remedy the fall experienced by the plaintiff."  Armour has not shown a constitutional violation.  His claim on this point is without merit.

H. Supervisory Liability

Armour states that each of the defendants were notified of the unconstitutional conditions by letters and grievances, but refused to take corrective action.  He says that Lorie Davis is the Director of TDCJ-CID and is "legally responsible for implementing and maintaining all TDCJ-CID regulations, including housing, maintenance, policies governing classification, security, safety,

health, medical, and the overall oversight of all conditions of confinement of offenders incarcerated in the Texas Department of Criminal Justice."  He adds that Davis "deprived plaintiff(s) of equal protection and due process and violated plaintiff(s) rights to be free of cruel and unusual punishment, wanton infliction of pain and suffering, denial of medical care, denial of proper recreation, denial of basic necessities of life, and freedom from inhumane conditions of confinement in violation of the 8th and 14th Amendments to the U.S. Constitution."  Armour has an identical paragraph concerning TDCJ Executive Director Bryan Collier.

With regard to Wardens Catoe, Richardson, and Cooper, Armour has identical paragraphs saying that each of the wardens were "legally responsible for the overall implementation and maintaining of all offenders under his official capacity housed at the H.H. Coffield Unit in Tennessee Colony, Texas, and the regulations of policies, procedures, and rules governing the day-to-day upkeep and care for all offenders under his authority at the confinement."  The paragraph states that each warden "deprived plaintiff(s) of equal protection and due process and equal treatment of individuals similarly situated and violated plaintiff(s) rights to be free of cruel and unusual punishment, wanton infliction of pain and suffering, denial of medical care, denial of proper recreation, denial of basic necessities of life, and freedom from inhumane conditions of confinement in violation of the 8th and the 14th Amendments to the U.S. Constitution."

Armour goes on to allege that "the defendants along with their agents and employees have implemented and maintained policies which enforced unconstitutional living conditions for years throughout TDCJ, particularly at the Coffield Unit, where this plaintiff(s) is housed.  Plaintiff(s) is prepared to produce documentation which will demonstrate that the Defendants have long been aware of these unconstitutional living conditions dating as far back as 1982, when Judge Justice declared these conditions unconstitutional. Thus plaintiff(s) allege that the totality of his confinement is unconstitutional."

He goes on to explain that "the totality of double-celling, sleep deprivation, the absence of toilets in the dayrooms and rec yards, overcrowded showers and extreme heat are sub-human living

conditions, which have been repeatedly over the years been brought to the attention of the defendants directly as well as through their agents and employees via the grievance process.  The answer most often given is that Coffield does not have to meet OSHA and ACA standards because it was built prior to the 2250 style units and ingress and egress is done every hour, yet they know from operation review (cameras) that the doors do not roll for two and three hours with the logs being falsified."

The Fifth Circuit has held that under §1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability.  However, a supervisor may be held liable if there exists (1) his personal involvement in a constitutional deprivation, (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation, or (3) if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.  Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987); Terry v. LeBlanc, 479 F.App'x 644, 2012 WL 3496399 (5th Cir., August 15, 2012).  Conclusory allegations of the creation or existence of a policy or custom are insufficient to establish supervisory liability.  Rivera v. Salazar, 166 F.App'x 704, 2005 WL 3588443 (5th Cir., December 30, 2005), citing Thompkins and Oliver v. Scott, 276 F.3d 736, 742 (5th Cir. 2002).

The Supreme Court has stated that the term "supervisory liability" in the context of a §1983 lawsuit is a misnomer because each government official, his or her title notwithstanding, is only liable for his or her own misconduct.  Iqbal, 556 U.S. at 677.  The Supreme Court rejected an argument that government officials may be held liable merely because they had knowledge or acquiesced in their subordinate's misconduct.  Id.  Following this precedent, the Fifth Circuit held that a prison supervisor was not liable since he was not personally involved in an incident.  Sterns v. Epps, 464 F.App'x 388, 2012 U.S. App. LEXIS 5678, 2012 WL 911889 (5th Cir., March 19, 2012).

Armour presents little more than conclusory allegations of the existence or creation of policies, which is insufficient to set out a basis for §1983 liability.  Although he asserts that his complaints about the conditions of confinement have been brought to the attention of the defendants, as well as their agents and employees, through the grievance process, the mere fact of receipt of grievances does not show personal involvement in a constitutional deprivation.  Tijerina v. Stanley, civil action no. 5:16cv102, 2019 WL 1396964 (E.D.Tex., March 28, 2019), *appeal dismissed as frivolous* -- F.App'x --, 2020 WL 2374834 (5th Cir., May 11, 2020), *citing* Whitlock v. Merchant, Civil Action No. 5:14cv119, 2015 WL 5909776 (E.D. Tex. Sept. 21, 2015) (mere fact of receipt of grievances does not show personal involvement in a constitutional deprivation); *see also* Cervantes v. Sanders, Civil Action No. 2:98cv187, 1998 WL 401628 (N.D. Tex. July 13, 1998) (reading or responding to prisoner's grievance does not show personal involvement by prison official); Amir-Sharif v. Valdez, Civil Action No. 3:06cv2258, 2007 WL 1791266 (N.D. Tex. June 6, 2007) (failure to take corrective action in response to a grievance does not rise to the level of personal involvement).

The Fifth Circuit has held the description of a policy or custom and its relationship to the alleged underlying constitutional violation cannot be conclusory but must contain specific facts.  Spiller v. City of Texas City Police Department, 130 F.3d 162, 167 (5th Cir. 1997); *see also* Colle v. Brazos County, Texas, 981 F.2d 237, 245 (5th Cir. 1993) (plaintiff may not infer the existence of a policy merely because harm resulted from an interaction with a governmental entity); Goldman v. Williams, civil action no. 4:14cv133, 2015 U.S. Dist. LEXIS 43705 (S.D. Tex., February 27, 2015), *Report adopted at* 101 F.Supp.3d 620 (S.D.Tex. 2015) (speculation that defendant must have had a policy or custom that violated the plaintiff's rights was not sufficient to set out a constitutional claim).  Armour's conclusory allegations concerning unspecified policies are not sufficient to impute liability to the Defendants.

Armour further contends that "the defendants' failure to properly train and/or supervise their agents resulted in the foregoing deprivations of Plaintiff(s) constitutional rights.  Such failure to train

and/or properly supervise amounts to a deliberate and reckless indifference to Plaintiff(s) constitutional rights and is wanton and reckless as to be a knowing reckless willingness that a deprivation of these rights occur."

The Fifth Circuit has held a plaintiff states an individual claim for a failure to supervise or train if: (1) the supervisor either failed to supervise or train the subordinate official, (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights, and (3) the failure to train or supervise amounts to deliberate indifference. Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011). In order for liability to attach based on an inadequate training claim, the plaintiff must allege with specificity how a particular training program is defective. Roberts v. City of Shreveport, 397 F.3d at 293. Conclusory allegations of failure to train are not sufficient to set out a claim under 42 U.S.C. §1983. Yates v. Unidentified Parties, 73 F.App'x 19, 2003 U.S. App. LEXIS 14998, 2003 WL 21744384 (5th Cir., July 28, 2003), cert. denied, 540 U.S. 1123 (2004), *citing* Spiller, 130 F.3d at 167. Plaintiff's pleadings do not set out any specific facts in support of his failure to train claim, much less allege with specificity how a particular training program is defective.

Similarly, the Fifth Circuit has held that conclusory allegations of failure to supervise are insufficient to set out a constitutional claim. Silva v. Moses, 542 F.App'x 309, 2013 U.S. App. LEXIS 20101, 2013 WL 5450799 (5th Cir,. October 1, 2013), *citing* Roberts, 397 F.3d at 292. Plaintiff does not set out any specific facts showing an actual failure to supervise, much less that any such failure amounted to deliberate indifference. *See also* Bohannon v. Doe, 527 F.App'x 283, 2013 U.S. App. LEXIS 11834, 2013 WL 2631197 (5th Cir., June 12, 2013), *citing* Iqbal, 556 U.S. at 678 (conclusory allegation of failure to adequately supervise and train does not plead a plausible cause of action even when generously read). Armour's conclusory allegations of failure to train or supervise likewise do not plead a plausible cause of action and cannot survive a motion for summary judgment.

I. Qualified Immunity

The Defendants have invoked their entitlement to qualified immunity.  This doctrine protects government officials from liability for monetary damages  in their individual capacities insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Thompson v. Mercer, 762 F.3d 433, 436-37 (5th Cir. 2014). Claims of qualified immunity require a two-step analysis, which may be done in either order: first, the court determines whether a constitutional right would have been violated on the facts alleged, and second, whether the right was clearly established at the time of the alleged violation.  Kitchen v. Dallas County, 759 F.3d 468, 476 (5th Cir. 2014).   Even if the official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable.  Jones v. Collins, 132 F.3d 1048, 1052 (5th Cir. 1998).

After the defendants properly invoke qualified immunity, the plaintiff bears the burden to rebut its applicability.  Kovacic v. Villareal, 628 F.3d 209, 211 (5th Cir. 2010).  Such a rebuttal requires a showing that all reasonable officials, similarly situated, would have known the defendants' acts violated the Constitution.  Tamez v. Matheny, 589 F.3d 764, 770 n.2 (5th Cir. 2009); Thompson v. Upshur County, 245 F.3d 447, 460 (5th Cir. 2001).

Armour's conclusory allegations are insufficient to overcome the qualified immunity defense or to show that the defendants acted in an objectively unreasonable manner in light of clearly established law.  Williams-Boldware v. Denton County, Texas, 741 F.3d 635, 643-44 (5th Cir. 2014).  TDCJ policies are not "clearly established law" for purposes of a qualified immunity analysis. See Morgan v. Swanson, 659 F.3d 359, 371 (5th Cir. 2011) (plaintiff seeking to defeat qualified immunity must show that the violation of a clearly established statutory or constitutional right).  Consequently, the Defendants are entitled to qualified immunity.

J. Class Certification

Armour seeks class certification on behalf of all present and future TDCJ inmates and states that there are questions of law and fact which are common to the class, including whether the totality of conditions - including double-celling, sleep deprivation, and heat exposure - amounts to cruel and unusual punishment, and whether the totality of these conditions amounts to intentional infliction of emotional distress. He argues that he is qualified to and will protect the interests of the class by seeking intervention by the United States as a party-plaintiff; he also seeks appointment of a special master.

In order to obtain class certification, a party must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3). Maldonado v. Ochsner Clinic Foundation, 493 F.3d 521, 523 (5th Cir. 2007). The threshold requirements of Rule 23(a) are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy, meaning that the representative party will fairly and adequately protect the interests of the class.

The Fifth Circuit has interpreted the adequacy requirement to "require the class representatives to possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation." Berger v. Compaq Computer Corp., 257 F.3d 475, 482–83 (5th Cir. 2001). As a result, the courts have generally held that *pro se* plaintiffs may not serve as class counsel because they are ill-suited to protect the interests of the class. McGrew v. Texas Board of Pardons and Paroles, 47 F.3d 158, 162 (5th Cir. 1995); *see also* Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir. 1975) (stating that "the competence of a layman representing himself [is] clearly too limited to allow him to risk the rights of others"). As a result, it would be "plain error to permit [an] imprisoned litigant who is unassisted by counsel to represent his fellow inmates in a class action." Id.; *see also* Caputo v. Fauver, 800 F.Supp. 168, 179 (D.N.J. 2002) ("Every court that has considered the issue has held that a prisoner proceeding *pro se* is inadequate to represent the interests of his fellow inmates in a class action."); Washington v. Louisiana, 2009 WL 2015556, at

*1, n.1 (E.D. La. June 30, 2009) (prisoner-plaintiff's *pro se* status rendered him incapable of satisfying the Rule 23(a) adequacy requirement).

Possibly recognizing this difficulty, Armour suggests that the problem could be overcome through intervention by the United States, or possibly through appointment of a special master.  The Fifth Circuit has stated that exceptional circumstances are necessary for appointment of a special master.  Sierra Club v. Clifford, 257 F.3d 444, 446 (5th Cir. 2001).  Armour has not shown that circumstances exist justifying the appointment of a special master.  While he states that he has contacted the United States, the Department of Justice has not to date intervened in his case.  Until such intervention occurs, Armour cannot satisfy the adequacy requirement of Rule 23(a)(4), and his request for class certification should be denied, subject to reconsideration in the event of intervention by the United States or some other party capable of meeting the adequacy requirement.

K. State Law Claims

Although Armour raises claims under the Texas Tort Claims Act, claims under this Act may not be brought in federal court.  Sherwinski v. Peterson, 98 F.3d 849, 851-52 (5th Cir. 1996); Tex. Civ. Prac. & Rem. Code §101.102(a) (a suit under the Texas Tort Claims Act "shall be brought in state court in the county in which the cause of action or a part of the cause of action arises.") Hence, the federal district court lacks jurisdiction over Armour's claims under the Texas Tort Claims Act. *See also* Bonner v. Pace, civil action no. 6:18cv373, 2018 WL 7288528 (E.D.Tex., November 6, 2018), *Report adopted at* 2019 WL 560245 (E.D.Tex., February 11, 2019).

To the extent that Armour seeks to raise state law claims under the rubric of supplemental jurisdiction, 28 U.S.C. §1367 provides that a district court may decline the exercise of supplemental jurisdiction if a plaintiff's state law claims raise novel or complex issues of state law, if the claims substantially predominate over the claims within the district court's original jurisdiction, if the district court has dismissed all claims over which it had original jurisdiction, or for other compelling reasons.  The Fifth Circuit has held that district courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over state law claims once all federal claims are dismissed; as a

general rule, the district court should decline to exercise jurisdiction over remaining state law claims when all federal law claims are eliminated before trial.  Heggemeier v. Caldwell County, Texas, 826 F.3d 861, 872 (5th Cir. 2016).  Because Armour's federal law claims lack merit, the Court should decline to exercise supplemental jurisdiction over the state law claims.

## VI. Conclusion

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Securities and Exchange Commission v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1994); General Electric Capital Corp. v. Southeastern Health Care, Inc., 950 F.2d 944, 948 (5th Cir. 1992); Fed. R. Civ. P. 56.

To avoid summary judgment, the non-moving party must adduce admissible evidence which creates a fact issue concerning existence of every essential component of that party's case; unsubstantiated assertions of actual dispute will not suffice.  Thomas v. Price, 975 F.2d 231, 235 (5th Cir. 1992), citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the defendant has shifted the burden to the plaintiff by properly supporting his motion for summary judgment with competent evidence indicating an absence of genuine issues of material fact, the plaintiff cannot meet his burden by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994); Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007).

The court has no obligation to sift the record in search of evidence to support a party's opposition to summary judgment.  Adams v. Traveler's Indemnity Co., 465 F.3d 156, 164 (5th Cir. 2008).  Instead, a party opposing summary judgment must identify specific evidence in the record that supports the challenged claims and articulate the precise manner in which that evidence supports

the challenged claim.  <u>Ragas v. Tennessee Gas Pipeline Co.</u>, 136 F.3d 455, 458 (5th Cir. 1998).  A properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show that a genuine factual issue exists.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A review of the pleadings and summary judgment evidence in this case shows that there are no disputed issues of material fact and the Defendants are entitled to judgment as a matter of law. It is accordingly

**ORDERED** that the Defendants' motion for summary judgment (docket no. 36) is **GRANTED** and the above-styled civil action is **DISMISSED WITH PREJUDICE**.  It is further

**ORDERED** that any and all motions which may be pending in this civil action are hereby **DENIED**.

**So ORDERED and SIGNED this 1st day of June, 2020.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE